CHARLES D. CHILDS v. WILLIAM B. PELLETT ET AL.

*Equity pleading — Multifariousness — Partnership — Use of firm name—Interest in real estate—Mortgage by one partner —Retiring member—Liability for firm debts— Payment—Renewals of bank notes.*

1. While the court may, of its own motion, raise the question of multifariousness, it is not bound to do so, or to permit the defendants to raise it upon the hearing where full justice can apparently be done upon the record.

2. The use by one partner of the firm name in indorsing his personal note, given to a bank in renewal of his individual note held by it as security for a loan, the proceeds of which he contributed to the firm capital in consideration of his admission as a member, is not within the scope of the partnership business, and, if so used without the consent of his copartners, the bank cannot hold the firm as indorser.

3. The owner of a manufacturing business conveyed to his brother, with whom he formed a partnership, an undivided one-half of the land used in connection with the business. Subsequently each brother deeded an undivided one-sixth of the land to a third person, who was admitted into the firm. It was understood between the partners that the land should be partnership property, and that each partner should hold his undivided interest for the purposes of the partnership. And it is held that the land is subject to the payment of the debts of the firm

4. One of the brothers retired from the firm under the following arrangement with his copartners: He sold to his brother his one-third interest in the firm business, and agreed to sell him his one-third interest in the real estate when he should pay

him $2,000, being the remainder of the purchase price agreed to be paid for all of his interest in the firm assets. The remaining partners, who succeeded to the business of the firm under a new firm name, agreed that the retiring partner might hold said undivided one-third of the real estate as security for the payment of said $2,000, and released him from all liability for existing debts. And it is held that it was within their power to do this; that, as between said retiring partner and themselves, they had no right to treat said interest in said real estate as partnership property for the purpose of adjusting accounts between themselves, without discharging the lien of the retiring partner upon it; that, if he held it in trust for the partnership, it was upon the condition that the remaining partners pay said $2,000; that this is true also as to creditors of the new firm, who have no greater rights as against said retiring partner in relation to said one-third interest in the real-estate than the firm had; but that said arrangement cannot deprive the creditors of the old firm of the right to the application of said interest in the real estate to the satisfaction of their claims, if it should become necessary, as all of the property of the retiring partner, including his said interest in the real estate, would be subject to such debts after all other partnership property should be exhausted, and therefore the rights of such partner must depend upon the question of his release by the creditors of the original firm.

5. Where the title to an undivided interest in partnership lands is vested in one member of the firm, a mortgage executed by him thereon to secure a firm debt is valid, and as to such interest has precedence over the claims of general creditors; but such a mortgage, if given to secure the individual obligation of the mortgagor, must be postponed to the payment of partnership debts.

6. Whatever may be the rule in other cases, in the absence of evidence of a contrary intention, renewals of notes at a bank ought always to be regarded as payment, because the banks themselves so regard them.

Appeal from Genesee. (Moore, J., presiding.) Argued October 9, 1894 Decided December 7, 1894.

Bill for the dissolution of a partnership, an accounting, the appointment of a receiver, and the cancellation of cer-

tain mortgages. Defendants appeal. Decree modified and affirmed. The facts are stated in the opinion.

*Wisner, Lee & Aitken,* for complainant.

*George R. Gold,* for defendant First National Bank.

*Durand & Carton,* for defendants Pellett.

HOOKER, J. Prior to the year 1880, defendant William B. Pellett was the owner of a sash and blind factory, in which he carried on business in the city of Flint. In January, 1881, his brother, John J. Pellett, engaged with him in the business, putting in additional capital, and receiving from William B. Pellett a deed of an undivided one-half of the real estate. In 1887 these parties arranged with the complainant, Childs, to become a member of the firm. He was to put in $5,000 in cash against the property of the firm then known as William B. Pellett & Co., the new firm to assume outstanding obligations, which included a debt of the firm to John J. Pellett of $3,500, and did not include a debt of $1,000, which the firm owed one Archie Brown. This debt had been secured by a real-estate mortgage upon the factory, but it was discharged by Archie Brown, so that the Pelletts could give to complainant a clear title to the undivided one-third of the real estate. This deed was given, and the complainant put into the concern $5,000 in cash. Of this sum $2,500 was borrowed of the First National Bank of Flint, one of the defendants, upon the note of complainant, which note, or a note given in renewal of the same, had upon it the name of the new firm, Pellett Bros. & Co., placed there unwarrantably by complainant, without the consent or knowledge of the Pelletts, and upon notes given in renewal, against their protest. This obligation is outstanding. The firm of Pellett Bros. & Co. obtained credit

at the First National Bank, taking up outstanding obligations, except $3,000 of the $3,500 owing to John J. Pellett, with money borrowed at the bank.

On July 15, 1890, John J. Pellett went out of the concern, under an arrangement with his partners substantially as follows: John sold to his brother, William, his one-third interest in the business, and agreed to sell him his one-third interest in the real estate when he should pay him $2,000 in addition to the sum paid down. William B. Pellett was to have a two-thirds and complainant a third interest in the new firm, which was to be known as the Pellett Table Company. The new firm gave its note for $3,000 to John J. Pellett for the amount due him from the firm. The notes of the new firm were given to the bank in renewal of notes of the old firm as they fell due. Complainant claims that the indebtedness to the bank was not increased, and it so appears. The business did not prosper, and an agreement was made between the Pellett Table Company, the bank, and one La Due, parties of the first, second, and third parts, respectively, dated December 26, 1890, which provided that on account of the company taking La Due as foreman and manager, the bank should pay for such lumber as the company should have delivered at its yard, the same not to exceed 500,000 feet at one time, the title to remain in the bank, and should sell the same to the company on weekly payments. It was also agreed that the company might deliver to the bank its manufactured tables, at a price and in lots mentioned. The sum received in excess of this price and expenses of sale was to be applied on the indebtedness to the bank. This agreement was to be in force during the year 1891. La Due entered upon the discharge of his duties under the contract, but William B. Pellett became dissatisfied, and on July 7, 1891, he mortgaged the one-

third interest in the real estate which stood in his name to his brother, John, to secure the sum of $3,000 which the firm owed John, and on the 18th of August he joined with John in a mortgage of $1,175 to Archie Brown, upon his claim against them, which was still unpaid. On September 8, 1891, the complainant executed, in the name of the firm, a chattel mortgage to the bank, covering all of the personal property of the firm, for the sum of $9,182.33.

At the expiration of the La Due contract the complainant filed the bill in this cause, making both of the Pelletts, the bank, and Archie Brown parties. · The bill asserts that the Pelletts procured Childs' assent to engage in the business in the first instance by fraudulent representations concerning the value of the plant and business and the amount of the firm debts; that the claims of Archie Brown and John J. Pellett are fraudulent, and that John J. Pellett is in justice and equity liable to pay his share of the debts of the firm, which is insolvent; and that the real estate, though held in the individual names of the parties, is partnership property, and subject to the debts of the concern. The bill prays that the mortgages held by Pellett and by Brown may be canceled; that John J. Pellett and William B. Pellett, respectively, be required to account to complainant, the firm and its receiver, and the court, and the former required to pay his proportion of the firm debts; that the bank also be required to account with the parties mentioned and the court for the money received under the La Due contract, and be enjoined from foreclosing its chattel mortgage; that the real estate mentioned be decreed to be partnership property, and applied to the payment of the debts of the firm; that a receiver may be appointed to ascertain the validity of the debts, and pay those found to be valid, under the direction of the court, and to continue or close up the business of the firm.

The Pelletts joined in an answer, in which they deny fraud in inducing complainant to become a member of the firm, assert complainant's fraudulent use of the firm's name in indorsing his $2,500 note, allege that the John J. Pellett claim of $3,000 was and is a valid obligation of the firm, and that the amount of $1,175 was justly due to Archie Brown from them at the date of his mortgage, allege a fraudulent conspiracy by Childs and La Due to deprive them of their interest in and right of control of the business and property, and, impliedly at least, that the First National Bank was a party to said fraudulent conspiracy. Said answer denies the validity of the chattel mortgage, for the reason that it was given without the consent of William B. Pellett, and also because the property was already in the custody of the bank, as security for its debt, and was to remain so until the succeeding January, 1892. It avers the validity of both mortgages given by the Pelletts upon the real estate, admits the right to an accounting, but denies complainant's right to any other relief. It also denies any liability upon the part of John J. Pellett for the debts of the firm.

The bank files an answer, claiming the benefits of a cross-bill. It denies all fraudulent combination upon its part, alleges the existence of a present claim against the old firm, and that John J. Pellett is liable thereon. It claims priority over the mortgages given by the Pelletts, which it charges to have been made with the intention of defrauding the bank, the firm being insolvent. It asks a receiver, and the adjustment of its claim.

Archie Brown answers, asserting the validity of his claim and mortgage. It seems to be conceded that the Archie Brown mortgage has been purchased by the bank, although our attention has not been called to any evidence thereof.

Counsel for the Pelletts contend that the bill is multi-

farious, and, though we do not so decide, it is possible that, had the question arisen upon demurrer, it would be open to that criticism, under the decision in the case of *Woodruff v. Young*, 43 Mich. 548. See *Snook v. Pearsall*, 95 Mich. 537. If so, it is because of the various charges of fraud between the parties, and not because all are not proper parties to the suit. All have an interest in the accounting, which all seem to admit should be had, and all interested are proper parties. *Wales v. Newbould*, 9 Mich. 45; 1 Daniell, Ch. Pr. 216, and cases cited. While the court might, of its own motion, raise the question of multifariousness, it is not bound to do so, or to permit defendants to raise it, inasmuch as full justice can apparently be done upon this record. *Payne v. Avery*, 21 Mich. 524.

Upon a review of the evidence we are convinced that complainant has no just cause to complain of fraud upon the part of the Pelletts. We also think that the $2,500 note indorsed by the firm is his personal obligation, as between him and them, which it is his duty to pay. The note of $3,000, given by the firm to John J. Pellett, is a just and valid claim against the firm, drawing interest at 7 per cent. from July 1, 1891. The Archie Brown claim was a valid claim as between him and the Pelletts, but was never such against Childs, or any firm of which he was or is a member. It must be postponed to the payment of the partnership debts, except as hereinafter stated. The Pellett Table Company assumed all other debts owing at the time of its origin by William B. Pellett & Co. or Pellett Bros. & Co., and, as between the Pelletts and Childs, John J. Pellett is not liable upon such obligations.

We find no evidence that the bank was a party to the alleged conspiracy against the Pelletts, and agree with the circuit judge that on the 1st day of January, A. D. 1892, the sum of $12,512.45 was due and owing from the Pellett

Table Company to said' bank, and that the sum should bear interest at 7 per cent. from that date. The note of $2,500 before mentioned is not a valid claim against said firm in favor of the bank, for the reason that such use of the firm name for the private purposes of complainant was not within the scope of the partnership business, and he never had the consent of 'his partners to use it. When first used, it was upon a renewal note, and, if it were not, there is nothing to indicate that the bank did not understand' the fact that the complainant, and not the firm, borrowed the money for which this note was given, which was inferable from the fact that he gave his personal obligation, if it had no other information.

We will next discuss the interest of John J. Pellett in the real estate, and the question of his liability to the bank. The real estate originally stood in the name of William B. Pellett alone, unless possibly it be a small parcel. The half of it was deeded to John J. Pellett, and subsequently each deeded a sixth to Childs. This left the title to an undivided one-third in each. There can be no doubt that this land was understood to be partnership property between the Pelletts and Childs, and each held his undivided one-third for the benefit and purposes of the partnership. As such it was subject to the payment of the debts of the firm, and perhaps the settlement of accounts between the partners, subject to any dower rights which may exist, but which we cannot consider, as the necessary parties are not before the court. Pars. Partn. §§ 272, 273, and notes. But it was within the power of the partners to dispose of this land, and competent for them to allow John J. Pellett to go out of the firm, taking his undivided one-third with him. This they seem to have done to the extent of agreeing that he should hold it as security for the payment of $2,000 by his brother, William, in a settlement between him and the firm,

whereby he sold his interest, and was released from liability upon existing debts. As between him and his partners, they had no right to treat this undivided one-third as partnership property for the purpose of adjusting accounts between themselves, without discharging John's lien upon it. If he held it in trust for the partnership, it was upon the condition that they pay the $2,000 due from William. This is true also of creditors of the new firm, who would have no greater rights against John J. Pellett in relation to this property than the firm had. But an arrangement of this kind could not deprive the creditors of the firm of Pellett Bros. & Co. of the right to the application of this property to the satisfaction of their claims, if it should become necessary, for all of the property of John J. Pellett, including this, would be subject to such debts after all other partnership property should be exhausted. Again, the $3,000 mortgage would be upon a footing somewhat similar, for, although it should be held that it was valid as against the new firm, it could not be as against creditors of the old firm, as all of John's property would be subject to levy, after exhaustion of the partnership property. Hence the rights of John J. Pellett as to these items must turn upon the question of his release by the bank from liability upon the indebtedness which originated while he was a partner, which never was paid, and which was represented by notes given in renewal, from time to time, by the new firm, without objection upon the part of the bank, whose cashier testifies that he supposed that the bank could not avoid such release.

The question whether renewal notes extinguish the debt is a vexed one, and is usually one of fact, and the courts have differed somewhat upon the presumptions which arise from the bare fact of renewal by a note bearing the signature of other parties. The subject was discussed in the

case of *Nightingale v. Chafee,* 11 R. I. 609, where it was held that an agreement to discharge a retiring partner will not be inferred from the acceptance of the note of the continuing partners. Whatever may be the rule in other cases, we concur with Prof. Parsons in the opinion that, unless there is evidence of a contrary intention, "renewals at bank ought always to be regarded as payment because the banks themselves so regard them." See 2 Pars. Notes & B. (2d ed.) p. 203. In commenting upon the opinion, the court in the Rhode Island case says, "He does not tell us how he knows they so regard them." This opinion of Prof. Parsons is not to be brushed away by a question. The practices of banks are well known, and from them their understanding may be inferred. Certainly, since the passage of the federal banking law, the whole course of national banks has been at variance with the idea that the original debt continued, and that successive renewals were additional and collateral security to the first obligation. The policy of the law is to require the banks to confine their loans to short-time paper, generally secured by indorsers, who may vary from time to time as the notes are renewed. We think it would be a surprise to those who indorse paper to be told that their obligation remains after the note has been taken up and canceled by successive renewals, each with a different indorser, and each in its turn taken up and canceled. *Smith v. Shelden,* 35 Mich. 42. In the present case the bank received the notes of the new firm after as well as before the La Due contract was made, and with full knowledge of the retirement of John J. Pellett, and supposed, as the cashier testified, that he was no longer liable, by reason of the course taken.

We think, therefore, that John J. Pellett's lien of $2,000 is a valid claim upon the undivided third of the land, as is also the mortgage for $3,000 given by William

upon the undivided third which stood in his name, said $3,000 being a valid firm debt, and that these have preced-ence over other debts as to those parcels, but not over the claim of Archie Brown, to which they are subject.

This seems to dispose of the questions raised in the case in accordance with the views of the learned circuit judge, except as regards the mortgages to Archie Brown and John J. Pellett. As to those the decree will be modified as herein indicated. In other respects it will be affirmed, with costs to the defendants the bank and John J. Pellett.

McGRATH, C. J., GRANT and MONTGOMERY, JJ., con-curred. LONG, J., did not sit.